JUSTICE HART, dissenting.
¶ 45 The majority contends that the language of section 13-64-403 is ambiguous as to whether its provisions require strict or substantial compliance. Because I think the majority is incorrect, I respectfully dissent.
*269 ¶ 46 The structure and language of section 13-64-403, C.R.S. (2017), suggest quite plainly that the legislature intended strict compliance with the statute's terms. Use of the term "shall" in subsections 403(3) and 403(4) is one important piece of evidence that the legislature intended health care providers to use the specific language, set out in the specific typography provided in the statute. I agree with the majority that, were use of the word "shall" in subsections 13-64-403(3) and (4) the only evidence of legislative intent in the language of the statute itself, the statute would be ambiguous. But the general assembly did more than simply state that HCAA arbitration agreements "shall" include notice of the binding nature of the agreement or the right to rescind. Subsection 403(3) sets forth, in quotation marks, the specific language that arbitration agreements "shall" include. § 13-64-403(3). And subsection 403(4) sets out a detailed, specifically worded four-paragraph notice that "shall be printed in at least ten-point, bold-faced type" and placed "[i]mmediately preceding the signature lines for such an agreement." § 13-64-403(4). We have never found that this kind of legislative specificity-the provision of specific and detailed language that must be included in a notice in order to comply with the law-required only substantial compliance. Instead, the cases referenced by the majority, in which we have concluded that the word "shall" required only substantial compliance with a statutory command, involve very different statutory provisions with significantly less detailed compliance requirements. See, e.g., Woodsmall v. Reg'l Transp. Dist., 800 P.2d 63, 65-67 (Colo. 1990) (interpreting a statute that required notice from an injured claimant to include a "statement of the amount of monetary damages that is being requested" to be substantially complied with by a notice that included a statement that claimant was not yet sure of the damages amount); Finnie v. Jefferson Cty. Sch. Dist. R-1, 79 P.3d 1253, 1256 (Colo. 2003) (analyzing whether a statute that required notice to be served on one of three different governmental individuals or entities could be satisfied by service on the Risk Management Department of one of those entities).
¶ 47 Further evidence of the legislature's intent that the provisions of section 13-64-403 be strictly complied with lies in subsection 9 of section 403, in which the legislature provided that "[i]f a health care provider ... fails to comply with the requirements of subsection (3) or (4) or both of this section," that failure "shall constitute unprofessional conduct as such term is used under the relevant licensing statute governing that particular care provider." § 13-64-403(9). The majority takes the severity of this consequence as evidence that the legislature must have intended substantial compliance. Maj. op. ¶ 35. Quite to the contrary, this language is a strong statement from the general assembly that it meant to have the provisions of section 13-64-403 complied with and was therefore willing to impose significant consequences on health care providers who fail to comply. Again, this language adds further support to the conclusion that section 13-64-403 should be interpreted under a strict compliance standard.
¶ 48 The majority dismisses the significance of subsection 10 of section 13-64-403, which also supports strict compliance, with the conclusion that its language is "circular." Maj. op. ¶ 25. Far from being circular, this provision is quite straightforward. In fact, an example from the majority opinion itself offers a demonstration of the legislature's purpose in including this language. As the majority notes, the following text is strictly compliant with the provisions of (3) and (4): No health care provider shall refuse to provide medical care services to any patient solely because such patient refused to sign such an agreement. Maj. op. ¶ 29. If this Kunstler Script, twelve-point, bold sentence meant that an arbitration agreement containing it was necessarily compliant with the HCAA, form would indeed be elevated over function. But the legislature provided in subsection 13-64-403(10) that even an agreement that technically complies with the "provisions" of the statute "may nevertheless be declared invalid by a court if it is shown by clear and convincing evidence that [it] failed to meet the standards for such agreements as specified in this section." § 13-64-403(10)(a).
*270 ¶ 49 The use of the two distinct words "provisions" and "standards" in this subsection must serve some purpose. See Lombard v. Colo. Outdoor Educ. Ctr., Inc., 187 P.3d 565, 571 (Colo. 2008) (quoting Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist., 109 P.3d 585, 597 (Colo. 2005) ) ("[W]hen examining a statute's language, we give effect to every word and render none superfluous because we 'do not presume that the legislature used language idly and with no intent that meaning should be given to its language.' "). The "provisions" of the section are its specific terms-the mandatory language and typography set out by the general assembly. "Standards" are different. Black's Law Dictionary defines "standard[s]" as "criteri[a] for measuring acceptability, quality, or accuracy." Standard, Black's Law Dictionary (10th ed. 2014). Here, the legislature intended to ensure that arbitration agreements under the HCAA are entered into voluntarily. § 13-64-403(1) ("It is the intent of the general assembly that an arbitration agreement be a voluntary agreement between a patient and a health care provider...."). Thus, subsection 10 ensures that even an agreement that strictly complies with the technical provisions of section 13-64-403 may nevertheless be invalidated if it is found to have been entered into without meeting the standards of voluntariness. An agreement that set forth the required notice in Kunstler Style, twelve-point, bold-faced type would quite likely fall under section 13-64-403(10)'s ambit of technically compliant yet still invalid agreements.
¶ 50 The use of the directive "shall," the provision of very specific and detailed language that is required to be used in HCAA-compliant arbitration agreements, and the provision of onerous penalties for failure to comply with the provisions of section 13-64-403 all demonstrate a legislative intent that the provisions of the law be complied with strictly. The fact that the legislature further provided that even a technically compliant notice might be invalidated if it did not comport with the legislative command that these binding agreements be entered into voluntarily further demonstrates that the legislature meant to protect against coercion in no uncertain terms. Strict compliance better serves that purpose and is plainly suggested by the section's language and structure.
¶ 51 In my view, the substantial compliance rule set out by the majority today will indeed increase litigation. Take this very case. The majority avoids addressing the typographical errors included in the notice provided to the Fischers by hewing to the language of the question presented, which asks only whether the lack of bold-faced type rendered the notice invalid. But we should not ignore the other defects in the Agreement simply because the question presented did not list them as well. The validity of the Agreement is in front of us, and we should address whether the notice-both its typography and its language-complied with the HCAA. The question of whether this notice substantially complies with the HCAA is harder when we include all of its defects in our analysis. Not only was this notice not in the required bold-faced type, but its statement of the right to rescind reads as follows: "You have the right to seek legal counsel and you and right [sic] to rescind this agreement...." This sentence does not accurately or adequately inform Charlotte or Judith Fischer of their right to rescind.[1] In addition to this nonsensical statement, the notice provision includes several other typographical errors that make it different from the specific language set forth in detail in section 13-64-103. Does this constellation of errors nonetheless permit the conclusion that the notice provided here met a substantial compliance standard? I am not at all convinced that it does. It certainly does not meet the strict compliance standard that I believe the legislature intended.
¶ 52 Colorow Health Care presented this arbitration agreement to the Fischers in *271 2012. While I agree with the majority that we did not analyze the question of strict or substantial compliance in Allen v. Pacheco, 71 P.3d 375 (Colo. 2003), the lawyers who prepared this 2012 arbitration agreement were certainly on notice that we had stated in Allen that non-compliance with "the language and bold-faced type notice required by the HCAA ... would render the agreement unenforceable." Id. at 381. And they were on notice that the legislature had provided specific language, in a particular typography, that HCAA arbitration agreements "shall" include. Compliance with the HCAA's provisions is not an onerous burden. Colorow Health Care should simply have followed the very clear rules set out by the statute and they should have done so in strict compliance with those rules.
¶ 53 Therefore, I respectfully dissent.
I am authorized to state that JUSTICE GABRIEL joins in this dissent.

The typographical error in the notice of right to rescind is rendered even more problematic by the fact that the contract states, immediately above the four paragraphs that purport to meet the requirements of section 13-64-103 that "this Arbitration Agreement may not rescinded [sic] by written notice to us from you within ninety days of signature." Accordingly, if anything, the mistyped notice suggested exactly the opposite of what the statute requires (i.e., that the Fischers had no right to rescind).